IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LITTLE ROCK FAMILY PLANNING
SERVICES,** *et al.*    PLAINTIFFS

v.    Case No. 4:20-CV-00470 BSM

**LESLIE RUTLEDGE, in her official capacity**    DEFENDANTS
as Attorney General of the state of Arkansas, *et al.*

## ORDER

The motion for temporary restraining order [Doc. Nos. 5, 14, 21] is denied. The motion for expedited leave to file a supplemental complaint [Doc. No. 3] is granted. The motion for expedited pre-hearing discovery [Doc. No. 7] is granted. The motion for leave to use a pseudonym and for a protective order [Doc. No. 13] is granted. The motion to substitute the proposed supplemental complaint [Doc. No. 19] is granted.

## I. BACKGROUND

Little Rock Family Planning Services and Doctor Thomas Tvedten ("LRFP") seek to enjoin the Arkansas Department of Health ("ADH") from enforcing its April 27, 2020 directive, requiring women seeking surgical abortions to obtain a negative COVID-19 test result 48 hours prior to the abortion. Memorandum of Law in Support of Motion for *Ex Parte* Temporary Restraining Order ("*Ex Parte* Memo"), Doc. No. 22, at 27; Amended Complaint ("Am. Compl."), Doc. No. 23, at ¶ 51.

In response to the COVID-19 pandemic, the ADH issued a directive on April 3, 2020, banning all non-medically necessary surgeries. *In re Leslie Rutledge*, 2020 WL1933122, at

*1 (8th Cir. 2020); Defendants' Opposition to Plaintiffs' Third Motion for *Ex Parte* Temporary Restraining Order ("Defendants' Opposition"), Doc. No. 24, at ¶ 3. The ADH issued that directive to preserve personal protective equipment ("PPE") and to reduce social contact during the COVID-19 crisis. Defendants' Opposition, Decl. Nathaniel Smith ("Smith Decl."), Doc. No. 24, Ex. A. The state announced on April 22 that the ADH would release new directives permitting elective surgeries under certain conditions, and on April 24, the ADH circulated its April 27 directive, the one at issue herein, which permits elective surgeries, but under the following conditions:

1. Only outpatients with no plans for overnights stay;
2. An American Society of Anesthesiologists rating of I or II. If they are II-rating, their disease process should be well controlled.
3. No contact with known COVID-19 patients during the past 14 days.
4. Patients must be asymptomatic for COVID-19 per ADH guidelines.
5. Start with a small initial volume of cases and increase incrementally as PPE availability and number of statewide occurrences dictate.
6. Each institution must have an ample supply of PPE for resuming elective procedures while maintaining a reserve should there be a resurgence of the virus. The acquisition of PPE is a matter for each institution to address and is not the responsibility of ADH.
7. For an asymptomatic patient to be a candidate for a procedure he/she must have at least one negative COVID-19 NAAT test within 48 hours prior to the beginning of the procedure.

*Id.* This directive applies equally to all surgical procedures and does not single out abortion providers or surgical abortions.

In a separate case involving the same parties, LRFP challenged the April 3 directive as an unconstitutional restraint on a woman's right to have a pre-viability abortion, and this court issued an order restraining the state of Arkansas from enforcing that directive. *Little*

2

*Rock Family Planning Servs.,* et al. *v. Leslie Rutledge,* et al., case number 4:19-cv-00449, Doc. No. 141. Just a couple of weeks ago in *In re Rutledge*, the Eighth Circuit took the extraordinary step of granting the state of Arkansas's request for mandamus, dissolving this court's temporary restraining order, and remanding.

The circuit's opinion clearly articulates the requirements for obtaining mandamus relief, and in doing so, it lays out the facts surrounding the COVID-19 pandemic that has been sweeping the country. In that the facts regarding the health crisis have not changed since the Eighth Circuit reached its decision, much of that ground will not be re-plowed. Some additional information that explains the present state of affairs comes from the ADH's daily COVID-19 tracker. Arkansas Department of Health, *Arkansas COVID-19 Update*, https://index.hdml#/f153ac8b6040e5896b05b47b17a647 (last visited May 6, 2020). Although the figures are updated within minutes, as this order is being prepared, 1,210,822 people in the United States have been diagnosed with COVID-19 and 71,463 people have died as a result. *Id.* In Arkansas, 58,713 people have been tested for the virus, 3,527 people have tested positive, and 83 people have died. *Id.* The highest concentration of positive tests and deaths in the state are in the counties of Central Arkansas. For example, Pulaski County, where LRFP is located, has tested 6,311 people; 565 have tested positive, and 21 have died. *Id.* Jefferson County, which is on the southern border of Pulaski County, has tested 1,545 people; 199 have tested positive, and 19 have died. *Id.* Faulkner County, which is on the northern border of Pulaski County, has tested 1,760 people; 77 have tested positive, and 2

have died. *Id.*

In support of its challenge to the April 27 directive, LRFP submits the declarations of four Jane Does. Jane Does 1, 3, and 4 are women who have traveled from Louisiana and Texas to obtain surgical abortions in Little Rock. Jane Doe 2 is an Arkansas resident seeking a surgical abortion. As explained in the complaint, Arkansas abortion providers perform two types of abortions: medication and surgical. Am. Compl. ¶ 19. "Medication abortion involves taking a combination of two pills, mifpristone and misoprostol, after which the patient expels the *contents of the pregnancy* in a manner similar to a miscarriage." *Id.* at ¶ 20 (emphasis added). There are two types of surgical abortions, and despite its name, a surgical abortion does not involve cutting or anesthesia. *Id.* at ¶ 21. In the first type of surgical abortion, aspiration abortion, the "contents of the uterus" is emptied by suction. *Id.* The record does not clearly explain the entire process used in performing the second type of surgical abortion, dilation and evacuation abortion, but that process can last from one to two days. *Id.*

Jane Does 1, 3, and 4 are seeking dilation and evacuation abortions and state that the COVID-19 testing requirement is so burdensome that it has prevented them from exercising their right to obtain pre-viability abortions. *Ex Parte* Memo, at 2. The stories recounted by these women are awful.

Jane Doe 1 is a mid-20s mother of two children, who found out she was pregnant in January. Mot. *Ex Parte* Temporary Restraining Order, Decl. Jane Doe 1 ("Jane Doe 1

Decl."), Doc. No. 21, Ex. 1.  She suffered post-partum depression after her second child was born in September 2019 and she is worried about her physical and mental health due to that depression and because she cannot afford another child.  *Id.*   She could not afford an abortion in January, so she waited until she received her income tax return.  *Id.*  Then she drove two hours to Shreveport, Louisiana to obtain an abortion, but the clinic was closed due to the COVID-19 crisis.  *Id.*

On April 28, when she was 21 weeks into her pregnancy, she drove approximately four hours to Little Rock to obtain a surgical abortion at LRFP.  *Id.*  When she arrived, she was told that she could not have the abortion unless she received a negative COVID-19 test. *Id.*  She says that she had been quarantined and has no COVID-19 symptoms.  *Id.*  She also states that she has tried to get a COVID-19 test but has been unable to do so because she has no coronavirus symptoms.  *Id.*  Moreover, by the time she left Little Rock on April 28, it was too late to get tested before the time she passes the legal limit to get an abortion on March 4.  *Id.*

Jane Doe 3 is an early-20s Texas resident who lives in an apartment with her two-year old daughter and her eleven-year old brother who has been living with her since their mother died in September 2019.  Mot. *Ex Parte* Temporary Restraining Order, Decl. Jane Doe 3 ("Jane Doe 3 Decl."), Doc. No. 21, Ex. 3.  She recently lost her job due to the COVID-19 crisis and has been feeling physical and mental stress since she became pregnant.  *Id.*  She was unable to have an abortion in Fort Worth, Texas because the clinic was not allowed to

perform surgical abortions during the COVID-19 pandemic. *Id.* She traveled four and a half hours to Little Rock on April 29 to have an abortion at LRFP, but was told that she first had to obtain a negative COVID-19 test result. *Id.* She found a clinic in Little Rock to give her a COVID-19 test but the lab could not guarantee that she received her results within 48 hours. *Id.*

Jane Doe 4 is a mid-20s married mother of two children who are less than six years old. Mot. *Ex Parte* Temporary Restraining Order, Decl. Jane Doe 4 ("Jane Doe 4 Decl."), Doc. No. 21, Ex. 4. Her older child requires a great amount of attention because he is autistic and non-verbal. *Id.* Her younger child also requires a great amount of attention because he is a toddler. *Id.* When her second child was born, she asked her doctor to perform a tubal ligation, but he would not do it because he thought she was too young and might change her mind. *Id.*

When she found out she was pregnant in February, she immediately knew she did not want to have another child, so she attempted to make an appointment with a Texas abortion clinic. *Id.* That clinic had a backlog and could not see her until March. Before she could have the abortion, she was told that Texas law had changed and that she could not have it. *Id.* She was later told that the law had changed again and that she could have an abortion, but Texas law required her to have a counseling session with the doctor performing the abortion, and she could not get an appointment with her doctor. *Id.*

Jane Doe 4 then drove five hours to Little Rock to get a surgical abortion at LRFP.

*Id.* Before her appointment, she was told that she needed a COVID-19 test, so she went to the University of Arkansas for Medical Sciences (UAMS) to get tested. *Id.* When she arrived, she was told that it was not testing asymptomatic people unless those people were having procedures at its hospital. *Id.* UAMS gave her the number of a testing clinic in Hot Springs, Arkansas. *Id.* She drove to that clinic and was initially turned away because she had no COVID-19 symptoms. *Id.* When she told the staff that she needed the test to obtain an abortion, they tried to talk her out of having it. *Id.* After arguing with them, and telling "these complete strangers about why having an abortion was the right decision for my family and me," they agreed to give her the test. *Id.* The staff told her that the test results would take five to seven days. *Id.*

Jane Doe 2 is not a party to the lawsuit but submits her declaration to provide additional support for the parties. She is a 36-year old mother of three children, two of whom are under the age of three and have respiratory issues, delayed speech, and physical development issues. Mot. *Ex Parte* Temporary Restraining Order, Decl. Jane Doe 2 ("Jane Doe 2 Decl."), Doc. No. 21, Ex. 2. She had pre-eclampsia and a caesarian section when she gave birth to one of her children. *Id.* She is a high-risk patient for this pregnancy due to her age and medical history. *Id.*

Fifteen weeks into her pregnancy, on April 21, she drove an hour to LRFP, and was informed that she had to have a negative COVID-19 test within 48 hours of undergoing a surgical abortion. *Id.* She received a COVID-19 test in Hot Springs on April 26 but did not

7

receive the results before her scheduled procedure on April 28. *Id.* She re-scheduled her procedure for April 30, had another test on the 28th, but had not received the results as of the time she filed her declaration on May 1. *Id.* She states that, if she cannot have an abortion at LRFP, she will have to travel to another state, and that she is not financially able to do so. *Id.*

Jane Does 1, 2, 3, and 4 state that their experiences show that the COVID-19 testing requirement for elective surgeries creates an undue burden on surgical abortions, and this acts as a ban on a woman's right have this procedure. *Ex Parte* Memo, at 23. In Arkansas, a woman has the right to have an abortion within 21 weeks and six days of her last menstrual period ("LMP"). *Ex Parte* Memo, at 2–3. Once a woman reaches ten weeks LMP, a surgical abortion must be performed to terminate her pregnancy. Am. Compl. ¶ 19. As of today, Jane Doe 1 is 22.1 weeks LMP, Jane Doe 3 is 22.2 weeks LMP, and Jane Doe 4 is 21.5 weeks LMP. *Id.*

LRFP also submits the declarations of Lori Williams, M.S.N. and Alison Stuebe, M.D., in support of its request for a temporary restraining order. Williams is a nurse practitioner and clinical director at LRFP. Mot. *Ex Parte* Temporary Restraining Order, Decl. Lori Williams ("Williams Decl."), Doc. No. 21, Ex. 5. Williams states that since the April 27 directive was handed down, she has been working diligently to assist her patients in obtaining COVID-19 tests. *Id.* Although she has contacted more than fifteen different testing facilities in and around Little Rock, she has been unable to find one that will test

8

COVID-19 asymptomatic patients, and is reliably able to return test results within 48 hours. *Id.* Since the April 27 directive has taken effect, she has had to turn away eight patients who were scheduled to receive surgical abortions, but who were unable to meet the testing requirement. *Id.* She states that the April 27 directive is uniquely problematic for women seeking abortions, as compared to patients seeking other medical procedures. *Id.*

Dr. Stuebe is an obstetrician-gynecologist (OBGYN) who states abortions are "time-sensitive, urgent, and cannot be safely postponed." Mot. *Ex Parte* Temporary Restraining Order, Decl. Allison Stuebe ("Stuebe Decl."), Doc. No. 21, Ex. 6. Surgical abortion must take place when the patient needs it because the harms that arise when it is denied or delayed are greater than the public health benefits of limiting surgical abortion to patients who are able to obtain a negative COVID-19 test result within 48 hours prior to the procedure. *Id.* Moreover, "[u]nder the current landscape of COVID-19 testing, a 48-hour turnaround for results is possible only with what is commonly referred to as 'rapid' testing" which has limited availability. *Id.* Further, several reports have questioned the accuracy of rapid tests, because many of those tests have been found to produce false-negatives at a rate of 14.8 percent. *Id.* Finally, the April 27 directive denies abortions to patients exhibiting COVID-19 symptoms, although, in certain circumstances, it may be reasonable to provide abortions to those women. *Id.*

In response, the ADH states the directive requiring a negative COVID-19 test before undergoing an elective surgery is the "ADH's considered judgment as to the best way

9

forward in easing Arkansas's emergency health measures while continuing to mitigate and manage the spread of the virus." Smith Decl. The ADH admits that some hospitals and ambulatory surgical centers have struggled with the COVID-19 testing requirement, but states that the difficulty in meeting that requirement is not unique to abortion clinics. *Id.* It is continuing to monitor the problem and manage the state's COVID-19 response, and points out that additional COVID testing facilities are coming online to help alleviate the difficulty raised by LRFP. *Id.*

Finally, ADH states that, despite the difficulties faced by Jane Does 1–4, the COVID-19 testing requirement is not so burdensome as to prevent women from receiving surgical abortion. It points out that it performed an unannounced inspection of LRFP's facility on May 1, and found that LRFP performed four surgical abortions between April 27 and May 1, and that all four women had timely COVID-19 testing results. Defendants' Opposition, Decl. Rebecca Bennett ("Bennett Decl."), Doc. No. 24, Ex. B.

In reply to the ADH's final point, LRFP states that the four abortions cited by the ADH are aberrations because "one [patient] was tested by Quest Diagnostics only because she is a healthcare provider," two were tested by UAMS before UAMS began refusing to test asymptomatic patients without procedures scheduled there, and the last was tested at Little Rock Diagnostics, which has not reliably returned COVID-19 test results within 48 hours. Supplemental Declaration of Lori Williams ("Williams Supp. Decl."), Doc. No. 25.

III. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008). Whether to grant such relief is within the sound discretion of the district court. *See Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006). A party seeking a preliminary injunction must prove that: (1) it will suffer irreparable harm if the injunction is denied; (2) the harm to the movant, if the injunction is denied, outweighs the harm to the non-movant if the injunction is granted; (3) there is a likelihood of success on the merits; and (4) an injunction is in the public's interest. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The same standards are applied to motions for temporary restraining orders. *See S.B. McLaughlin & Co. V. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).

III. DISCUSSION

LRFP's request for a temporary restraining order is denied because it cannot show its likelihood of success on the merits. *S.B. McLaughlin*, 877 F.2d at 708.

In *Rutledge*, the Eighth Circuit took the extraordinary step of granting defendants' request for mandamus relief, dissolving this court's order restraining the ADH from enforcing its April 3 directive, and remanding. *In re Rutledge*, 2020 WL1933122, at *4–5. In so doing, it cited *Jacobson v. Massachusetts*, 197 US. 11 (1905) and *In re Abbott*, 954 F.3d 772 (5th Cir. 2020) in determining that, when a state is faced with a public health crisis

such as that presented by COVID-19, it is permitted to take measures that may infringe on constitutional rights. *In re Rutledge*, 2020 WL1933122, at *15. In so ruling, the court held that:

> the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. Rather, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members. Therefore, while constitutional rights do not disappear during a public health crisis, the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Id.* at *13 (quoting *Jacobson*, 197 U.S. at 31, 38; *In re Abbott*, 954 F.3d at 783 (internal quotations omitted)).

The Eighth Circuit further held that this court abused its discretion when it found that the April 3 directive was facially unconstitutional because its total ban on elective surgeries prohibits nearly all pre-viability abortions past ten weeks LMP. *Id.* at *12. It also held that this court is required to perform the analysis provided in *Jacobson* when determining whether the April 3 directive is constitutional. *Id.* at *13.

The Eighth Circuit determined that the ADH's April 3 directive was issued in response to the COVID-19 pandemic and that, even if it was "an outright ban on all pre-viability surgical abortions, it is not subject to constitutional challenge unless it 'has no real or substantial relation to' the public health crisis, or 'is, beyond all question, a plain, palpable invasion of' a woman's right to elective abortion." *Id.* at *14 (quoting *Jacobson*, 197 U.S. at 31; *In re Abbott*, 954 F3d at 784). For these reasons, the April 27 directive can be

reviewed only if it lacks a "real or substantial relation" to the public health crisis or it is "beyond all question, a plain palpable invasion" of the right to abortion. *See In re Rutledge*, 2020 WL1933122, at *14.

*Rutledge* creates a very obvious problem for plaintiffs because the April 27 directive is much less burdensome for abortion seekers and providers than is the April 3 directive. Indeed, the April 3 directive halted all elective surgeries, including all surgical abortions, "except where immediately necessary to protect the life or health of the patient." *Id.* at 7–8 (quoting the ADH's April 10, 2020, cease-and-desist letter to LRFP). The April 27 directive, however, permits elective surgeries, including surgical abortions, upon the satisfaction of certain precautions. Consequently, the burden plaintiffs face in challenging the April 27 directive is much greater than the challenge they faced in *Rutledge*.

Before applying the *Jacobson* framework, it is instructive to look at the disputed issues in that case. *Jacobson v. Massachusetts* was decided by the Supreme Court in 1905, and addressed whether the state of Massachusetts could hold Henning Jacobson criminally liable for violating a city board of health regulation requiring that he take the smallpox vaccination. During the smallpox crisis, the board of health in Cambridge, Massachusetts adopted a regulation requiring all persons to be vaccinated. *Jacobson*, 197 U.S. at 12. The board of health's regulation was enacted pursuant to Massachusetts law authorizing cities to adopt regulations mandating vaccination when necessary for the public health or safety. *Id.* The board of health found that smallpox was prevalent within the city and that it was

necessary to vaccinate everyone to exterminate the disease. *Id.* Jacobson refused to be vaccinated and was criminally prosecuted and found guilty. *Id.* at 13–14.

The Supreme Court affirmed the lower court and held that "the liberty secured by the Constitution ... does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26; *see also In re Rutledge*, 2020 WL1933122, at *4 (quoting *Jacobson*). Indeed, "[o]rganized society could not exist with safety to its members" if the liberty secured by the Constitution imparted an absolute right to each person to be free from all restraint. *Jacobson*, 197 U.S. at 26. Moreover, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27; *In re Rutledge*, 2020 WL1933122, at *4 (quoting *Jacobson*). "Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will," especially during a health crisis. *Jacobson*, 197 U.S. at 26–27.

*Jacobson* established a framework for determining whether a state's response to a public health crisis passes constitutional muster, which was captured recently by the Fifth Circuit:

> The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual–that is, arbitrary and oppressive. At the same time, courts may not second-guess the wisdom or efficacy of the measures.

*Abbott*, 954 F.3d at 784–85 (quoting *Jacobson*, 197 U.S. at 31, 38); *In re Rutledge*, 2020

WL1933122, at *5 (quoting *Abbott* and *Jacobson*). In *Abbott*, the Fifth Circuit faced similar issues as those faced in *Rutledge* and presented here. The court analyzed *Roe v. Wade*, 410 U.S. 113 (1973), and its progeny and determined that, while none of the abortion cases "involved a state's postponement of some abortion procedures in response to a public health crisis . . . the effects on abortion arising from a state's emergency response to a public health crisis must be analyzed under the standards in *Jacobson*." *Id.* at 785–86. The Eighth Circuit agreed. *See In re Rutledge*, 2020 WL1933122, at *5.

The ADH's April 27 directive, just like the April 3 directive, was issued in response to the COVID-19 pandemic. Consequently, it is not subject to constitutional challenge unless it has no real or substantial relation to the COVID-19 health crisis or is "beyond all question, a plain, palpable invasion" of a woman's right to elective abortion. *Jacobson*, 197 US. at 31; *In re Rutledge*, 2020 WL1933122, at *5; *In re Abbott*, 954 F.3d at 784–85.

    A.    <u>The April 27 ADH Directive Relates to the COVID-19 Health Crisis</u>

The April 27 directive clearly relates to the COVID-19 health crisis. It requires patients to test negative for COVID-19 within 48 hours prior to having an elective surgery. This requirement, as well as the six other requirements, clearly relates to the state's legitimate interest in attempting to limit the spread of COVID-19. The testimony of LRFP's witnesses is very logical and is well-taken; however, it does not untie the connection between COVID-19 testing (and the other six requirements) and limiting the spread of the virus. Whether the April 27 directive will actually reduce the spread of coronavirus is not for a court to decide,

because it would be error to "usurp the functions of [the political branches] of government . . . by second guessing the state's policy choices in crafting emergency health measures." *In re Rutledge*, 2020 WL1933122, at *6 (citing *Jacobson*, 197 U.S. at 28 and *In re Abbott*, 954 F.3d at 784).

      B.    <u>The April 27 ADH Directive is Not Beyond all Question, a Plain, Palpable Invasion of a Woman's Right to an Abortion</u>

The April 27 directive's COVID-19 testing requirement is not beyond all question, a plain, palpable invasion of the right to have an abortion. First, notwithstanding the parties' history of fighting over abortion, the record does not support the position that the ADH promulgated the April 27 directive with an eye toward limiting abortions. It appears from the record, as well as the national conversation that is taking place, that the entire country is attempting to grapple with the effects of COVID-19. Indeed, states, as well as the federal government, are diligently attempting to strike a balance between public health and safety on one hand, and individual liberty on the other hand. This tug-of-war is playing out across the country, whether it concerns the forced closing of houses of worship or threatening criminal prosecutions against people of faith, so that they cannot exercise their First Amendment right to freedom of religion; closing gun shops so that people cannot exercise their Second Amendment right to own firearms; ordering people to maintain social distancing or to remain in their homes so that people cannot effectively exercise their First Amendment right to freely assemble; and the list goes on. Everyone is trying to find the balance.

Second, given the health crisis facing the world, the country, and the state, the ADH's

April 27 directive is reasonable. As with the criminal prosecution for failing to be vaccinated, as addressed in *Jacobson*, the directive at issue clearly infringes on a right protected by the Constitution. On the other hand, the April 27 directive will expire on June 19, 2020. *See* Governor Asa Hutchinson, EO 20-25, *Executive Order to Amend Executive Order 20-23 Regarding the Public Health Emergency Concerning COVID-19, for the Purpose of Renewing the Disaster and Public Health Emergency to Prevent the Spread of and Mitigate the Impact of COVID-19* (May 5, 2020). *See also* Ark. Code Ann. 12-75-107 ("No state of disaster emergency may continue for longer than sixty (60) days unless renewed by the Governor."). Moreover, non-elective surgeries, including those abortions that are necessary to preserve the lives of the mothers, are not covered by the directive.

Finally, although the April 27 directive makes it more difficult to have a surgical abortion during the ongoing crisis, it is undisputed that surgical abortions have still taken place. Bennett Decl. Although it is of some concern that atypical circumstances permitted those women to meet the testing requirement, *see* Williams Supp. Decl., that concern is mitigated by the fact that new COVID-19 testing facilities are coming online to alleviate this problem, *see* Smith Decl.

## IV. CONCLUSION

This decision has been agonizingly difficult for two reasons. First, it presents the tug-of-war between individual liberty and the state's police power to protect the public during the existing, grave health crisis. Second, it affects four specific women, as well as other

unknown women, who, based on their declarations, are very troubled. There is a strong urge to rule for them because they are extremely sympathetic figures, but that would be unjust.

For the reasons provided above, the motion for an *ex parte* temporary restraining order [Doc. Nos. 5, 14, 21] is denied.

IT IS SO ORDERED this 7th day of May 2020.

_____
UNITED STATES DISTRICT JUDGE